**NOT FOR PUBLICATION**


UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY


| | |
|---|---|
| VERNON WALDEN, INC., a corporation,   : | |
| : | Civ. No. 01-4826(DRD) |
| Plaintiff,             : | |
| : | **O P I N I O N** |
| v.               : | |
| : | |
| LIPOID GmbH, a foreign corporation,   : | |
| LIPOID AG, a foreign corporation, and   : | |
| LIPOID USA, L.L.C., a California   : | |
| Limited Liability Company,       : | |
| : | |
| Defendants.      : | |
| _____: | |

Thomas Campion, Esq.
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, New Jersey 07932

Terry L. Trantina, Esq.
Stern & Kilcullen
75 Livingston Avenue
Livingston, New Jersey 07068
       Attorneys for Plaintiff

Jay B. Itkowitz, Esq.
Donald A. Harwood, Esq.
Itkowitz & Harwood
The National Newark Building
744 Broad Street, 16th Floor
Newark, New Jersey 07102-3802
       Attorneys for Defendants

**Debevoise, Senior District Court Judge**

In this action plaintiff, Vernon Walden, Inc. ("VWI") sues LIPOID GmbH ("Lipoid-

Germany), LIPOID AG ("Lipoid-Switzerland") and LIPOID USA, L.L.C. ("Lipoid-California").

Lipoid-Germany manufactures and sells phospholipid and Lecithin products and their derivatives

(collectively "Phospholipids").   VWI asserts five general claims.  It alleges that: i) Lipoid-

Germany breached a July 1996 written agreement between Lipoid-Germany and VWI as

supplemented by a written agreement dated June 30, 1998 (collectively the "Agreement").  The

Agreement provided, among other things, that "VWI will be the exclusive representative in

North America for [Lipoid-Germany] with regard to all their Phospholipids"; ii) Lipoid-Germany

breached its obligation to VWI under the Agreement to act in good faith and with fair dealing;

iii) Lipoid-California tortiously interfered with VWI's contract with Lipoid-Germany; iv) Lipoid-

Germany engaged in secondary price discrimination in violation of Section 13(a) of the

Robinson-Patman Act, 15 U.S.C. §13(a), by selling its phospholipid products to VWI's

competitor, Lipoid-California, at more favorable prices and terms than those at which it sold the

products to VWI; v) Lipoid-California violated Section 13(f) of the Robinson-Patman Act by

knowingly receiving a discriminatory price prohibited by Section 13(a) of the Act.

Lipoid-Switzerland (which became, in effect, Lipoid-Germany's alter ego for the purpose

of the Agreement) counterclaims for $427,312.48 which it alleges VWI owes it for phospholipid

products purchased but not paid for and $40,470.50 on account of a credit that VWI received but

did not pass on to a customer to whom the payment was owed.  Lipoid-California counterclaims

for $32,425 which it alleges VWI owes it for phospholipid products purchased but not paid for.

A more detailed account of the relationship of the parties and the events leading up to this

action is set forth in the court's January 20, 2005 opinion which addressed the parties' cross-

motions for partial summary judgment.  The court held: i) VWI was a "purchaser" of

2

phospholipid products from Lipoid-Germany and not merely a sales representative or agent of Lipoid-Germany; ii) the question whether Lipoid-California and Lipoid-Germany were a single economic entity such that transactions between them were merely intracompany transfers - which would not be subject to Robinson-Patman liability - rather than "sales" at discriminatory prices in favor of Lipoid-California, which would be subject to Robinson-Patman liability, presented a question of fact that could not be resolved on a summary judgment motion; iii) a competitive nexus between VWI and Lipoid-Germany (at least two contemporaneous sales to VWI and Lipoid-California) had been shown in that there was a February 23, 2001 sale of phospholipid products by Lipoid-Germany to Lipoid-California for resale in the United States and a March 5, 2001 sale to VWI; and further, that VWI and Lipoid-California competed at the same functional level; i.e., as a purchaser and reseller of Lipoid-Germany's products to customers in the same geographic market; iv) the court struck certain of Lipoid-Germany's Robinson-Patman Act affirmative defenses, i.e., meeting competition, changing market conditions, functional discount, cost justification and availability; v) the factual question as to the relationship between Lipoid-Germany and Lipoid-California prevented granting Lipoid-California's motion for summary judgment on VWI's Section 2(f) Robinson-Patman Act claim and on VWI's tortious interference claims, vi) the supplemental agreement is ambiguous as a matter of law with respect to its effects upon the duration provisions of the original representation agreement and with respect to its effect upon the exclusivity provision of the original representation agreement.

In the summary judgment opinion the court addressed but did not reach a conclusion with respect to Lipoid-Germany's argument that VWI's Robinson-Patman Act claims are barred because a claim of secondary-line discrimination can be made only where the plaintiff is an

actual purchaser from the party charged with the price discrimination - Lipoid-Germany in the instant case, citing Klein v. Lionel Corp., 237 F.2d 13 (3d Cir. 1956).  Lipoid-Germany noted that once VWI began placing orders with Lipoid-California, VWI did not purchase products directly from Lipoid-Germany, the party charged with the discriminatory pricing.  VWI contended that the language of §2(a) prohibits both direct and indirect price discrimination, and that Klein has been limited or overruled by Perkins v. Standard Oil Co., 395 U.S. 642 (1969) and FTC v. Fred Meyer, Inc., 390 U.S. 341 (1968).  Because the court found that VWI had purchased directly from Lipoid-Germany, on one occasion, it did not address the issue of whether Klein is still good law.

Defendants have filed five in limine motions.

First, defendants move to exclude evidence offered in support of VWI's Robinson-Patman Act claims of indirect purchases of phospholipid products by VWI from Lipoid-California, i.e., purchases that took place between May 4, 2001 and September 28, 2001.

Second, defendants move to limit VWI's proof of Robinson-Patman Act damages and to preclude its calculation of damages for periods occurring before and after the period of the alleged price discrimination.

Third, defendants move for a pre-trial hearing and/or exclusion of the testimony and report of VWI's expert witness, Dr. Frank Tinari on the ground that it is unreliable under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Fourth, defendants move for an order excluding any expert testimony or opinions from VWI's principal, James Borkan.

Fifth, defendants move for an order excluding evidence of any pre-1997 VWI sales data.

4

## II. <u>Robinson-Patman Act</u>

Defendant's motions implicate primarily VWI's Robinson-Patman Act claims, and consequently, before addressing the motions it would be useful to set forth certain principles governing those claims.

In accordances with Section 2(a) of the Act the seller must be engaged in commerce. Lipoid-Germany undoubtedly was engaged in commerce.  The discrimination must involve at least two reasonably contemporaneous sales transactions to at least two different purchasers.  In the court's summary judgment opinion it found two sales - a February 23, 2001 sale of a phospholipid product by Lipoid-Germany to Lipoid-California and a March 5, 2001 sale of a phospholipid product by Lipoid-Germany to VWI.  The relationship of Lipoid-Germany and Lipoid-California is yet to be determined.  If these "sales" were merely intracompany transfers, there would be no Robinson-Patman Act liability on account of those sales.

To establish a discrimination claim the commodities sold must be of like grade and quality.  At the summary judgment stage it was assumed that the phospholipid products at issue met this qualification.  On the in limine motions Lipoid-Germany asserts that the products sold to VWI and Lipoid-California were not of like grade and quality.  According to it the product sold to Lipoid-California on February 21, 2001 was phosphotidyl serine 40% powder for sale in the nutritional supplement market.  Over time Lipoid-California was supplied with and primarily sold Lipoid-Germany's phosphotidyl serine 20% liquid and phosphotidyl 40% powder.  VWI, on the other hand was sold only Lipoid-Germany's phosphotidyl 20% powder.  There is therefore a factual issue whether the commodities involved were of like grade and quality.

Further, to establish a Robinson-Patman Act violation a plaintiff must establish that there

5

was price discrimination (meaning a difference in price or other conditions of sale) and that "as

of the time the price differential was imposed, the favored and the disfavored purchasers

competed at the same functional level i.e., all wholesalers or all retailers, and within the same

geographical market."  Best Brands Beverage, Inc. v. Flastaff Brewing Corporation, 842 F.2d

578, 584 (2d Cir. 1987).  It does not appear that there is serious dispute that VWI can establish

these elements.

The critical issues will be whether VWI can establish competitive injury and antitrust

damages.  Pertinent to the resolution of these issues is the decision of the Court of Appeals in

Stelwagon Mfg. Co. v. Tarmac Roofing, 63 F.3d 1267 (3d Cir. 1995), a case upon which all

parties in the instant action rely.

Stelwagon was a wholesale distributor of roofing, siding and related construction

materials.  Its principal customers were small to medium sized roofing contractors located in the

Philadelphia area.  In 1988 Stelwagon entered into an exclusive distributorship agreement with

Tarmac, a manufacturer of modified asphalt products ("MAD").  Stelwagon carried out its

obligations under the agreement but in 1989 it learned that Tarmac was selling MAD to two

competitors - Standard and Celotex - at preferential prices.  He sued Tarmac in 1992 on price

discrimination and breach of contract claims.  The jury awarded Stelwagon damages on both the

contract and the Robinson-Patman Act claim.  The district court denied Tarmac's motion for

judgment as a matter of law.

On appeal Tarmac asserted that Stelwagon had failed to present sufficient evidence to i)

establish a prima facie Robinson-Patman violation, ii) prove actual antitrust injury and iii)

support the award of damages under the Clayton Act.  The Court of Appeals first noted:

By its terms, the Robinson-Patman Act is a phophylactic statute and does not require that the alleged discrimination must in fact have harmed competition. Instead, a violation is established upon a showing that "the effect of such discrimination may be to substantially lessen competition."

For the purposes of the Robinson-Patman Act, price discrimination means nothing more than a difference in price charged to different purchasers or customers of the discriminating seller for products of like grade or quality.  Price discrimination alone, however, is not illegal per se.  Rather, in order to establish a prima facie violation of Section 2(a), "a reasonable possibility of harm, often referred to as competitive injury, must be shown.

63 F.3d at 1271 (citations omitted).

After concluding that Stelwagon had established that as the disfavored purchaser it was engaged in actual competition with Standard and Celotex as of the time of the price differential, the Court turned to the question whether Stelwagon had established injury to competition.  It noted that "injury to competition is usually shown in either of two ways: proof of lost sales or profits, or under the Morton Salt test, proof of a substantial price discrimination between competitors over time" 63 F.2d at 1272 (citations omitted).  The district court had held that the record contained evidence that would support a jury finding of harm to competition under either method.  The Court of Appeals concluded that injury to competition had been established by proof of a substantial price difference over time.

Stelwagon had submitted evidence that showed that the price differential was substantial and that it was in effect for several years.  Stelwagon's expert, Dr. Perry, reported concerning the substantiality of the price differentials.  His report was based on an examination of Tarmac's invoices on sales of MAPs.  The invoices reflected the date of sale, distributor, product name, number of rolls and prices charged, covered a period from 1987 (the year before Stelwagon contracted with Tarmac) through late 1991 (two years after Stelwagon learned of the

discriminatory pricing and the year before suit was instituted) and included sales of six types of Tarmac MAPs to Stelwagon and seven other distributors which at the time resold MAPs in the Philadelphia area.

Dr. Perry reported that between 1988 and 1991 Standard received prices ranging from 5 to 20 percent lower than the prices charged to Stelwagon, and during this same period Celotex received prices which ranged from 10 to 25 percent lower than the prices Tarmac charged Stelwagon.  With respect to APP 48, the Tarmac product which accounted for 40.4 percent of the total sales of all products included on the invoices, Standard received a 12.5 percent discount relative to prices paid by Stelwagon, while Celotex received a discount of at least 10 percent. The Court held that "[b]ased on these figures, we believe the price differential Tarmac offered Standard and Celotex only can fairly be characterized as substantial."  Id. at 1273.

When competitive injury is established as part of a prima facie care it is sufficient to support injunctive relief, but further inquiry is required to determine a plaintiff's entitlement to treble damages under Section 4 of the Clayton Act., J.L. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990).  At that point, as stated in Stelwagon, "a plaintiff must prove a causal connection between the price discrimination and actual damages suffered.  Traditionally, however, antitrust plaintiffs have not been held to an unduly rigorous standard of proving antitrust injury."  63 F.3d at 1273.  The district court held that the testimony of Dr. Perry and anecdotal evidence of Stelwagon's customers' statements established that Stelwagon actually lost sales to Celtex and Standard.  The Court of Appeals disagreed.

The court held that hearsay statements of Stelwagon employees about out-of-court statements of Stelwagon's customers concerning purchases of Tarmac MAPs from Standard and

Celotex at prices lower than Stelwagon's prices were not admissible in evidence.

Dr. Perry testified as to Stelwagon's lost sales and profits resulting from the price discrimination.  Starting in 1988, he assumed that but for the price advantage of other distributors Stelwagon's sales of MAPs would have followed a pattern similar to Stelwagon's sales of other products (excluding MAPs).  Based on the assumption that but for Tarmac's price discrimination, Stelwagon's sales of MAPs would have tracked its sales of non-modified products, Dr. Perry concluded that Stelwagon lost $257,000 in profits as a result of the illegal pricing policy.

The Court of Appeals held "standing alone, the expert's opinion, as reflected in his testimony and report, are insufficient to support the finding of actual damage.  Significantly, Dr. Perry's analysis failed to sufficiently link any decline in Stelwagon's MAPs sales to price discrimination.  The sales may have been lost for reasons apart from price discrimination - reasons that Dr. Perry's analysis apparently did not take into account."  Id. at 1275.

The Court of Appeals found that Stelwagon's Section 4 claim for damages failed in that "[n]ot only did Stelwagon fail to offer any documentary evidence as to the effect of the discrimination on resale prices, it also failed to identify a single lost customer."  Id. at 1275-76.  Citing Feeser, supra, the Court stated "proof requirements of Section 4 are satisfied by direct evidence of lost sales, evidence that the substantial price discrimination reflected in the resale price of Feeser and the favored competitors directly resulted in Feeser losing certain sales and losing profits on others, and expert report out-lining the magnitude of the price difference."  Id. at 1276.

III.  Defendants' Motions

9

A.  <u>Motion to Suppress Evidence of "Indirect Purchases"</u>

The Court has previously held that VWI has satisfied the Robinson - Patman Act requirement of establishing at least two contemporaneous sales to VWI and Lipoid - California by evidence of the February 23, 2001 sale of phospholipid products by Lipoid - Germany to Lipoid-California and the March 5, 2001 sale of phospholipid products by Lipoid-Germany to VWI.  Thereafter VWI made seven purchases from Lipoid - California between May 4, 2001 and September 28, 2001.  Defendants seek to exclude evidence of those sales for Robinson-Patman Act purposes.

If it is established that Lipoid - California is part of a single enterprise with Lipoid - Germany, there can be no Robinson-Patman violation.  If it is established that Lipoid -Germany and Lipoid - California are separate entities, a further question arises.  It is defendants' position that under Court of Appeals authority, a claim of secondary line price discrimination under the Robinson-Patman Act cannot be made as a matter of law where the aggrieved party does not purchase products from the party charged with the discriminatory pricing.  <u>Klein v. Lionel Corporation</u>, 237 F.2d 13 (3d. Cir. 1076).  If defendants are correct, VWI's seven purchases of phospholipid from Lipoid - California between May 4, 2001 and September 28, 2001 did not constitute price discrimination on Lipoid - Germany's part, and the only discriminatory pricing that could be charged to it was the March 5, 2001 sale to VWI.

VWI contends that <u>Klein</u>, upon which defendants rely, is no longer good law and that the sales by Lipoid - California to VWI are to be deemed sales by Lipoid - Germany.  It is unnecessary to resolve the issue at this time, because evidence of the Lipoid - California sales to VWI is admissible as relevant to the breach of contract claims.  Therefore, disposition of

10

defendants' final motion to suppress evidence of their sales for Robinson-Patman Act purposes will be deferred.

For the guidance of the parties, the Court's preliminary conclusion is that the decision in FTC v. Fred Meyer, Inc., 390 U.S. 341 (1968) did not reject Klein v. Lionel Corp., 237 F.2d 13 (3d Cir. 1956) and that the rule in Klein is still the prevailing doctrine.  The holding in Meyer applies to section 2(d) of the Robinson-Patman Act whereas Klein, and the present case, deal with violations of section 2(a).  Courts have refused to extend the ruling in Meyer to section 2(a) violations "because to do so would arguably require vertical price maintenance in violation of the Sherman Antitrust Act."  Lewis v. Philip Morris, Inc., 355 F.3d 515, 527 (6th Cir. 2004) (citing FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019, 1026 & n.8 (2d Cir. 1976); The Iams Co. v, Falduti, 974 F.Supp. 1263, 1271-72 (E.D. Mo. 1997)).

The Third Circuit has also held that Klein remains good law.  In Edward J. Sweeney & Sons Inc. v. Texaco, Inc., 637 F.2d 105 (3d Cir. 1980), the court cited Klein in stating that indirect purchasers cannot state claims under section 2(a) of the Robinson-Patman Act. Accordingly, the court held that plaintiffs, two petroleum distributors, lacked standing to sue a manufacturer under section 2(a) of the Robinson-Patman Act because they purchased their product from a wholesaler, not the manufacturer.  Id at 119.  As that ruling was made more than a decade after the Supreme Court ruled in Meyer and Perkins v. Standard Oil Co., 395 U.S. 642 (1969), it is clear that the Third Circuit has determined that the rule in Klein remains good law.

B.  Limiting Proof of Damages: Defendants' second motion seeks an order limiting VWI's and Dr, Frank Tinari's, its expert, proof of damages to exclude periods before and after the period of alleged price discrimination.  In his expert's report, Dr. Tinari opines that VWI

11

suffered a Robinson-Patman Act loss if $1,729, 191 for the period from October 2000 through March 2003, which when trebled, yields total damages of $5,187,573.  Noting that ". . . [A] plaintiff must prove a causal connection between price discrimination and actual damages suffered," Stelwagon Manufacturing Company v. Tarmac Roofing Systems, Inc., 63 F.3d 1267, 1273 (3d Cir. 1995), defendants contend that there can be no recovery of damages sustained before and/or after the period of discrimination sales - in this case February 2001 (the date when Lipoid - Germany made its first discriminatory sale to Lipoid - California) and September 2001 (when VWI's contract was terminated).  Defendants contend October 2000 through December 2000 period and the September 2001 through March 2003 period should be excluded from any Robinson-Patman Act damages calculations.

In light of the disposition of Defendants' motion concerning Dr. Tinari's report, it is unnecessary to resolve the issue raised by this motion.

C.  Dr. Tinari's Testimony and Report: Defendants' third motion concerns the report and expected testimony of Dr. Frank D. Tinari.  Dr. Tinari prepared a report dated March 30, 2004 computing breach of contract damages and antitrust damages.  This report has been updated by an October 31, 2005 letter report.  The supplemental report was not received by either the defendants or the Court until November 8, 2005, and defendants have moved to preclude its use at trial or testimony based upon it.  The Court ruled from the bench and denied the motion. Defendants assert that Dr. Tinari's expert opinions both as to contract damages and as to antitrust damages cannot stand muster under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) and In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994), cert. denied, 513 U.S. 1190 (1995).

Dr. Tinari has a Ph.D in economics from Fordham University.  He is professor emeritus of economics at Seton Hall University.  He has been active in numerous professional organizations; he has authored numerous articles and spoken frequently upon economic subjects and has provided expert testimony at more than 500 trials, arbitration hearings and oral depositions.  VMI asked him to determine the economic losses resulting from termination of the Agreement and alleged breaches of contract and to calculate VWI's damages resulting from discriminatory pricing.

Dr. Tinari analyzed VWI's business, noting that between 1997 and 2001, phospholipid products have averaged approximately 20 percent of VWI's sales and that VWI sold such products mainly to customers who manufactured pharmaceutical products, with some sales to customers who manufactured nutritional supplemental products.

Dr. Tinari constructed a representative market measure to reflect pharmaceutical industry performance.  The measure is a publicly-traded company share-price index weighted by volume. Price and volume data for the relevant companies were obtained from Yahoo finance.  The competitors were identified from industry research and conversations with VWI's James Borkan. Dr. Tinari concluded that the sample of VWI's customers publicly traded was a sufficiently representative market.  From the sample he prepared a pharmaceutical industry share price index for the period January 1995 - January 2004 which showed an annual compound growth rate of 32.90 percent.  For this period September 2001 - January 2004, the index exhibited an annual compound growth rate of 17.08 percent.  Based on this data,  Dr. Tinari assumed that the current market would have continued to expand and with it VWI's sales.  He established a "conservative" annual compound growth rate of  ten percent for pharmaceutical sales.

13

Dr. Tinari pursued the same general procedure to establish an annual compound growth rate for the nutritional supplement market and arrived at a three percent  figure.

To take into account the fact that a dollar in the future is worth less than a dollar today, Dr. Tinari computed a discount rate, recognizing various risk factors.  He arrived at a discount rate of 20%.

Dr. Tinari based his computations of damages on the assumption that Lipoid-Germany terminated the Agreement without just cause and that it was to continue for an indefinite time beyond the initial termination dated of September 30, 2004 and assumed VWI would have continued to sell Lipoid products until 2007 and realized income from commissions as provided in the Agreement.  He outlined the difficulties of obtaining an alternative supply of phospholipids.

As reflected in the October 31, 2005 update, Dr. Tinari calculated  i) the commission revenue VWI would have made on Lipoid products from September 2001 though December 2007 as $1,073,770 using Lipoid-Germany data or $1,262,173 using VWI data, making numerous adjustments in arriving at these figures;  ii) the total amount of the ten percent commissions due VWI on the sales effected by Lipoid-California as $317,449; iii) using extraordinarily complex adjustments, the losses on account of projected Lipoid-California sales

14

after March 2003 as $535,213; iv) unpaid commissions as $17,635; v) reduced commissions as $44,663 and vi) mitigation costs as $51,293.

Dr. Tinari summarized the breach of contract loss under two scenarios: one in which the nutritional sales from Lipoid-California were used (the nutritional sales through March 2003 and the nutritional sales after March 2003 on which VWI lost commissions) and the other scenario in which those sales were excluded.  Under the first scenario, the loss ranged from $2,040,023 (utilizing Lipoid-Germany data) and $2,228.426 (utilizing VWI data).  Under the second hypothesis, the loss ranged from $1,187,361 (utilizing Lipoid-Germany data) and $1,375,764 (utilizing Vernon Walden data).

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of opinion or otherwise.

In *Daubert*, the United States Supreme Court held that the Court must exercise a gatekeeping function when determining the admissibility of proposed expert testimony under Rule 702.  The standards of admissibility under Rule 702 and the Court's gatekeeping function

15

are applicable not only to scientific expert testimony, but also to any expert testimony that is based on "technical" and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The proffered expert testimony is admissible only if it is based on a reliable foundation and is "relevant to the task at hand." *Daubert*, 509 U.S. at 597.

As framed by the Third Circuit, the expert must be qualified as an expert based on a broad range of specialized knowledge, skill or training. *In re Paoli* F.3d at 741. While the level of expertise may affect the reliability of a particular expert, the Third Circuit Court of Appeals generally has taken a policy of liberal admissibility with respect to an expert's qualifications. *See id*.

"The second requirement of Rule 702 is that the expert must testify to 'scientific, technical or other specialized knowledge [that] will assist the trier of fact." *Id*. at 742 (quoting Fed.R.Evid.702); *see also Kimho Tire*, 526 U.S. at 141. The testimony is admissible so long as the "process or technique the expert used in formulating the opinion is reliable." *Id*. at 742. The test of reliability is a flexible one, and "the law grants the district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kimho Tire*, 526 U.S. at 142 (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997) (emphasis in original).

16

The inquiry which must be made to determine the reliability of scientific evidence and the eight non-exclusive factors set forth in Paoli are not particularly relevant in the present case.

Dr. Tinari unquestionably is qualified based on his broad range of experience as an economist.  He will be testifying about a subject that requires specialized knowledge and his testimony would assist the jury in the difficult task of determining what damages VWI suffered if it succeeds in establishing that Lipoid-Germany breached the agreement.

The defendants challenge the reliability of Dr. Tinari's calculation of damages on the ground that it utilizes a hypothetical stock index model - rather than actual sales figures - to project the growth rate of phospholipid sales in the pharmaceutical market and the nutritional market.  He did not, as defendants assert, select the companies he used in his representative sample solely on companies suggested by James Borkan.  As he stated, "[t]he competitors were identified from industry research and conversations with James Borkan" (emphasis added).  Dr. Tinari is certainly competent to conduct that research and to select representative companies.  All this data that entered into Dr. Tinari's computations came from recognized sources.  There may well be flaws in Dr. Tinari's analysis.  If so, defendants are capable of providing expert opinion testimony that will disclose those flaws.  There are no flaws so obvious that his testimony about contract damages should be excluded.  Defendants' motion to exclude Dr. Tinari's opinion

17

concerning contract claims damages will be denied.

Dr. Tinari's opinion concerning damages purportedly incurred by reason of Lipoid-Germany's violations of the Robinson-Patman Act presents a different picture.  His object was to compute the additional profit VWI could have made at the favorable price level had it been able to purchase products on the same terms as Lipoid-California.  He accepted as established that Lipoid-California's advantage was in four main areas:  i) a lower product purchase price, ii) liberal end-user customer pricing ability, iii) reduced shipping costs, and iv) extended payment terms.  He also noted that VWI was forced to purchase phospholipid products for resale to the nutritional supplement market from Lipoid-California at Lipoid-California's list selling price less ten percent.  Thus, a price floor was created for VWI, prohibiting it from pricing competitively in that market.

Dr. Tinari describes in his report how these various differentials prevented VWI from competing with Lipoid-California in the phospholipid market.  If the factual data upon which Dr. Tinari bases his opinions can be established and if the other elements of a Robinson-Patman Act claim are proved, his opinion that there was substantial damage to competition is sufficiently reliable to go to the jury.

Dr. Tinari then proceeds to the next step, which is to establish antitrust damages, the lost

18

sales and profits VWI actually sustained resulting from the discrimination.  To arrive at an actual damages figure, Dr. Tinari relies almost entirely on estimates of James Borkan provided in his deposition and in telephone interviews:

. Borkan's estimate that of the $16.57 million in pure phospholipids imported into the United States in 2001, approximately $4 million are related to imports used in the nutritional supplement market.

. Borkan's testimony that of the $4 million, approximately 40 percent of the market is engaged in co-branding deals with Lucas - Myer and thus unavailable to VWI.

. Borkan's estimate given to Dr. Tinari over the telephone that of the remaining $2.4 million, VWI would have captured approximately 50 percent of the market, or $1.2 million.

. Borkan's estimate made during the same telephone interview that it would take VWI approximately nine months to capture 40 percent of the market.  Dr. Tinari stated that he and Borkan assumed an annual growth of three percent, or 0.742 per quarter.

. Borkan's "feeling" that capturing 50 percent of the remaining market is a reasonable estimate.

. Borkan's "estimate" of the gross margin "he believes" VWI could have realized had it sold phospholipids products to the nutritional supplement market with the transfer prices

19

received by Lipoid-California.

Based on the deposition testimony, telephone estimates, beliefs and feelings of James Borkan, Dr. Tinari derived gross margin for the products and averaged the gross margin for each product over each quarter to determine the average quarterly gross margin VWI would have enjoyed at this transfer price. He sets forth their average quarterly gross margins for the fourth quarter of 2000 through the first quarter of 2003. He then enumerates the additional operating costs VWI would have incurred if it aggressively marketed in the nutritional supplement market. The details of Dr. Tinari's antitrust loss calculations are set forth in a table. He concludes:

> Thus, the lost profit due Vernon Walden as a result of the discriminate pricing between Lipoid-Germany and Lipoid-California is equivalent to the gross margin Vernon Walden could have realized at the favorable terms of sale, less the costs established above. Our calculations are based upon the time in which Lipoid-California was in operation from October 2000 through March 2003. Base [sic] upon the aforementioned assumptions, we calculated a loss of $1,729,191, as seen in the chart on the following page. It is our understanding that damages under the Robinson-Patman Act are to be trebled; yielding total damages under this section of **$5,187,573**.

This opinion must be rejected on two grounds. First, even if it were admitted into evidence, it fails to meet the requirements set forth in Feeser and Stelwagon for the computation of antitrust damages. As in Stelwagon, the expert in the instant case established substantial price

20

differentials which justified a finding of competitive injury.  As in <u>Stelwagon</u>, the expert in the instant case made certain assumptions on the basis of which he computed the lost profits of the disfavored customer.  But, as in <u>Stelwagon</u>, the expert failed to base his conclusions on actual lost sales resulting from the discriminatory pricing.  This, as in <u>Stelwagon</u>, is insufficient to establish Section 4 damages.

In <u>Stelwagon</u>, the Court noted that the expert's analysis failed to sufficiently link any decline in Stelwagon's MAP sales to price discrimination, stating that "sales may have been lost for reasons apart from the price discrimination - reasons that Dr. Perry's analysis apparently did not take into account."  63 F.3d at 1275.  In the present case, there were reasons other than price discrimination that caused VWI to lose sales.  As to pharmaceutical sales, James Borkan testified that the lack of sales in the 1997 - 2001 period was "attributable to the up-and-down nature of the business for liquid products at the time."

Referring to their VWI sales reverses, Mr. Borkan further testified, "Well, it happened to be unique to those particular years.  One of our customers went bankrupt.  Another customer did a significant portion of business with us on one product but due to difficulties they had with Lipoid's quality and delivery they discontinued that."

Still further, as to VWI customers Nexstar, Gilead,  Mr. Borkan testified, "Well, we had

gotten a million dollar approximately piece of business from Nextstar, Gilead.  I don't remember
- at the time they changed their name and unfortunately Lipoid delivered a few lots that failed
their specifications.  They caused them a lot of problems in their production.  They shut down.
It was after many years of working on it and finally had an opportunity to get a significant piece
of their business and due to that they advised me in the fall they would no longer be purchasing
the — any significant quantities from Lipoid."

It is true that these non-price reasons for the loss of business occurred in connection with
VWI pharmaceutical sales where quality of the phospholipid product may be more critical than it
is in connection with sales to the nutritional supplement industry.  Nevertheless, similar non-
price events must also prevail in that area of VWI's business, which make it necessary for
antitrust damage proofs to connect sale losses directly to price discrimination rather than
portraying a generalized theory of loss of sales over a period of time.   This Dr. Tinari's report
has failed to do.

Even if Dr. Tinari's calculations of Section 4 damages satisfied the requirements of
Feeser and Stelwagon, it would be inadmissible for another reason.  It cannot pass muster under
Daubert.  Unlike his calculation of contract damages, Dr. Tinari's Section 4 damages calculations
are not based on authoritative industry data or recognized financial data.  The very foundations of

his calculation is based on the deposition testimony, estimates, feelings and beliefs of James

Borkan, who will be a principal beneficiary of the trebled damages sum of $5,187.573.

It is VWI's contention that Dr. Tinari is entitled to rely upon the information and opinions

that Mr. Borkan provided him because that is the kind of information upon which experts in the

field of economics justifiably rely.  According to VWI, Mr. Borkan is "[a]n officer with over 15

years of experience - - - His everyday responsibilities as chief financial officer included

monitoring sales and financial information, as well as developing a complete knowledge of the

other products or distributors in the market."  (VWI's Opposition at 25).  While, as discussed in

connection with Defendants' fourth motion, Mr. Borkan is probably qualified to give lay

opinions with respect to aspects of VWI's own business and certain aspects of the competition it

encounters in the marketplace, he is not sufficiently qualified to provide the global opinions upon

which Dr. Tinari relied in computing antitrust damages.

Mr. Borkan had two years of college education and spent one semester at the University

of Switzerland.  Upon completing his education, he entered employment with Pharmacaps, a

small concern that his father started that manufactured gel capsules for the pharmaceutical

industry.  In l987 his father started VWI and Mr. James Borkan joined him.  VWI acts as a

manufacturer's representative and as a trader in specialty ingredients for the nutritional,

23

pharmaceutical and food industries.  In its representative capacity, VWI acted as an agent of the manufacturer.  In its trader capacity, it found sources of products, such as phospholipids and then distributed them.

Although VWI describes Mr. Borkan as "chief financial officer" who has had over 15 years of experience," in fact VWI was a three-person firm consisting of Mr. Borkan's father, who was its owner, organizer, and at least until recently its chief executive officer, and one other person.  Mr. James Borkan has no specialized education, he is neither an economist nor an accountant.  He has had fifteen years experience seeking to sell the products, including phospholipids with which VWI deals.  During the course of his sales efforts, he has undoubtedly become familiar with the existence of potential customers in the pharmaceutical and nutritional fields and with the existence of competitors for the business to be derived from those potential customers.  Similarly, he must have become familiar with competitive conditions in the phospholipid market.

That being said, this knowledge hardly qualifies Mr. Borkan to provide Dr. Tinari with such specific data as the amount of imported phospholipid that is used in the nutritional supplement market, the approximate percentages of the estimated amount that is engaged in co-branding deals with Lucas-Myer or that VWI would have captured 50 percent of the imported

24

phospholipid that was not engaged in co-branded deals with Lucas-Myer.  Mr. Borkan's estimates or feelings that VWI would take nine months to capture 50 percent of the market in product not subject to Lucas-Myer co-brand deals and his estimates or beliefs as to the amount of the gross margins VWI could have received had it sold phospholipid products to the nutritional supplement market with the transfer prices received by Lipoid-California are speculative in the extreme and far beyond the capabilities of Mr. Borkan with his limited accounting and economics background to give.

It does not appear that Dr. Tinari made any effort to verify Mr. Borkan's estimates either through consultation with industry experts or applicable literature.  Because the foundation of Dr. Tinari's Robinson-Patman Act damages opinion is unreliable, the opinion itself is unreliable. Defendants' motion to exclude Dr. Tinari's report and testimony will be granted insofar as it relates to Clayton Act § 4 damages and will be denied in all other respects.

D.  Exclusion of James Borkan's Opinion

Defendants' fourth motion is for an order excluding any expert testimony and/or opinions of VWI's principal, James Borkan.  VWI has not designated Mr. Borkan as an expert witness pursuant to F.R.C.P. 26, and there is no suggestion that it intends to call him as such at the trial. It is possible, however, that during the course of his testimony he will be asked questions the

25

answers to which may call for an opinion which would be admissible under Fed.R.Ev. 701.

Although Mr. Borkan does not have the expertise to give the industry-wide opinions and

economic projections upon which Dr. Tinari based his antitrust damages opinion, he may well on

the basis of his experience be in a position to give less global or technical opinions relating to the

phospholipid market.  The admissibility of such opinions will be ruled upon when offered at the

trial.  Defendants' fourth motion will be denied.

### E.  Exclusion of  Pre-1997 VWI Sales Data

Defendants fifth motion is for an order excluding evidence of VWI pre-1997 sales data.

The ground for such motion is that during pre-trial proceedings VWI objected to and failed to

provide any discovery concerning pre-1997 sales data and information, arguing that it was

irrelevant.  Defendants contend that they would be prejudiced by VWI's use of such evidence

because they were never afforded discovery concerning that information.

VWI counters with the observation that during pretrial proceedings it often objected to

the production of pre-1997 documentation not on the ground of relevancy but on the ground that

defendants already possessed such documentation.

Defendants' motion to preclude pre-1997 documentation will be denied without prejudice

to their right to object at trial to the admission of any such documentation of which they did not

26

have possession or to which they did not have access and if they can show prejudice.

## IV.  CONCLUSION

A decision on defendants' first motion to exclude evidence offered in support of VWI's Robinson-Patman Act claims of indirect purchases of phospholipid products by VWI from Lipoid-California, i.e., purchases that took place between May 4, 2001 and September 28, 2001, will be deferred.  In view of the disposition of Defendants' motion to exclude Dr. Tinari's opinion concerning Robinson-Patman Act damages, Defendants' second motion to limit VWI's proof of Robinson-Patman Act damages to the period during which discriminatory sales were made need not be addressed.  Defendants' third motion to exclude the testimony and report of VWI's expert witness, Dr. Tinari, will be granted insofar as the testimony and report purport to compute VWI's Robinson-Patman Act damages and denied in all other respects.  Defendants' fourth motion for an order excluding any expert testimony or opinions of James Borkan will be denied.  Defendants' fifth motion to exclude evidence of any pre-1997 VWI sales data will be denied without prejudice to Defendants' right to object at trial to the admission of any such documentation of which they did not have possession or to which they did not have access and if they can show prejudice.  The Court will file an appropriate order.

27

s/Dickinson R. Debevoise
DICKINSON R. DEBEVOISE
United States Senior District Judge

DATED: November 15, 2005